Please call the next case. 111-3648, O'Sage v. Teddick-Latkin Good morning, Your Honors. Counsel John Popelka here on behalf of the claimant Joseph Hedl. Subsequent to the arbitrator's decision, but prior to the commission decision, the Illinois Supreme Court came out with their decision in interstate scaffolding. The holding in that case was that where a claimant seeks temporary total disability benefits, the dispositive inquiry is whether the claimant's condition had stabilized. In other words, had the claimant reached maximum medical improvement. That standard was pointed out to the commission in argument. The commission issued its decision, but did not take, the majority opinion did not take that holding into account. Instead, what the commission stated was the primary issue in this case is whether or not petitioner was laid off by respondent on February 26th of 2009, or whether petitioner requested a voluntary layoff on that date. And pursuant to the interstate scaffolding decision, that is not the proper standard that the commission should have used. Is it your thesis that if a person is injured at work, and he's entitled to temporary total disability, and he is offered a job within his restrictions so that he can work, but he turns around and says I quit, he's still entitled to TTD? Do you think that's what the interstate scaffolding says? I don't think that's what it says, but I don't think that's what occurred here. Well, if he says lay me off, that's the same thing as I quit. He said there's a 45-day period for electricians. I don't care why he did it. The question is did he do it? Now, if he did do it, I think you're extending interstate scaffolding to say that forget about offering him work. He doesn't have to work. He can turn around and say I quit, and he still gets his TTD. And I don't think that's what interstate scaffolding says. Well, let's look at interstate scaffolding then in the context of two cases that it discussed, the Schmidgale case and the Granite City case. In Schmidgale, the claimant was offered a light-duty position, had went back to work within that position, had reached MMI, and then had applied for Social Security disability benefits. And the argument there was, well, if you are gaining Social Security disability benefits, you voluntarily removed yourself from the labor force. In Granite City, somewhat different, the police officer goes back to work, they accommodate his light-duty restrictions, and he elects at that point to take his disability pension. He removes himself from the labor force. Now, what the court said, what the Supreme Court said in interstate scaffolding was, in those two cases, it wasn't the voluntariness of the withdrawal from the labor force that mattered. The question was still, had the claimant's condition stabilized? And they indicate that the decisions were proper in Schmidgale and Granite City for that reason, not because of the voluntariness. You don't look at the voluntariness of the withdrawal. That's specifically stated in the interstate scaffolding decision. But I don't know if you're answering the question. If you carry your logic out and you don't look at the voluntariness, then, as he says, somebody's injured, they quit. According to your analysis, they would be entitled because the voluntariness of whether you quit or not is irrelevant to the TTD. Well, I think that's correct. Well, if they're offered a job within their restrictions and they refuse to take it, they're not entitled to TTD any longer. And that doesn't make any difference whether they've reached MMI or not. Well, that may be true in theory, but the problem is we're getting off course because that's not this case. His light-duty restrictions were never honored at any point during the course of his employment. That's what makes this case different, and that was going to be my next point. In this case, the commission specifically found he had not reached maximum medical improvement. His condition had not stabilized. They awarded prospective medical care in the form of additional treatment to the shoulder and additional treatment to the ankle. So we have that issue out of the way. The condition had not stabilized. But let's go to the were those restrictions ever honored. The man who was in charge of the entire project, Thomas Brummel, said that William Burge and William Roth offered the claimant light-duty work after his February 14th appointment. Okay, so that's our starting point. It was Burge's job and Roth's job to give him light-duty work. So what does Burge say? Burge is the next level down on the command. Burge said, I didn't do anything personally about offering him light-duty work, but I put Roth in charge of making sure he had light-duty work. Okay, let's then go to what Roth says. Roth says no one told him before the February 25th of 2009 that the claimant had restrictions. That's on page 188 and 189 of the record. So contrary to what Brummel says, the person in charge of providing the light-duty job didn't even know about the light-duty until the day before the layoff took place. So what was the claimant doing during that job? Was he working within the light-duty capacity? No. How do we know that? Because of the claimant's testimony. But let's forget his testimony. Let's just look at the testimony of Burge and Roth. Burge testified that he didn't work on the same floor as the claimant, but he saw him working. And he saw him doing work roughing walls. So I asked Burge, if his restrictions were no prolonged standing and no working above chest level, wouldn't that violate his restrictions? Grudgingly, he answered, yes, I guess it would. Same with Roth. Roth said that his job was doing roughing of walls and he saw him doing more or less his regular activities. I asked him, if you were doing those things, would you be interpreting something that, yes, he does come back to exactly what you just said he did on February 25th? That was the very same day he requested a layoff. That was the same day. It was part of the same conversation. But if Roth learns of it, as you say, he didn't know about it. He wasn't going to, you are implying, accommodate the restrictions. He learns for the first time. The guy says, oh, by the way, I want a layoff. But he did say that. But he didn't specifically. He didn't say he wanted a layoff? Well, it wasn't. He didn't exactly say it in that manner, Your Honor. I don't mean to contradict what you're saying. I'm just saying there was a different context that he said it. The electricians have this 45-day rule. The claimant testified he's been on the short end of that. If you get laid off after 45 days, you go to the bottom of the seniority list. And what that meant for him was he had to wait almost two years to get another job. What he said to Burge was, hey, listen, if you guys are going to lay me off after 45 days, could you at least have the decency to do it before the 45th day? Because then I don't fall to the bottom of the list. That's what the request was. He wasn't saying get me off the job. He was saying if you guys are going to get rid of me off this job, please do it before the 45 days so that I'm not out of work for another two years. Okay. That's what the claimant testified to. But what about Burge? Or did anybody else testify contrary to that's how he put it? The claimant had a ---- He said if you're going to lay me off in 45 days, do it now or ---- Well, nobody who was in a position to have talked to him, he talked to Carl Thomas and had that conversation. Burge admitted that he was not the first person who was asked about the layoff. He didn't have that conversation with Burge. It was Carl Thomas. But Burge did acknowledge that he hired him. He knew that the hire date was January 27th. He certainly knew that the gentleman had at least 25 more days. And he said, he contradicted himself. First he said if you ask for a layoff, it's immediate. Boom. You're gone. That's the first thing he said. But then just a page or two later in the transcript he says, well, yes, these electricians do ask for this all the time. There's nothing unusual about it. And we can accommodate it. If he's got 25 more days left, he can work the 25 days. Burge wasn't the only guy who said it. Ross said it too. Ross said that if the claimant had 25 days left to work, it would have been okay for him to stay 25 days. So what happened here? Let me just ask another question. I mean, if he goes and he says, if you're going to lay me off, please do it within 45 days, they honored that request, didn't they? They said, okay, you're laid off. Well, why didn't they wait 25 days? Well, he didn't say lay me off on the 44th day. Well, but as the claimant said, only an idiot would ask to walk off the job at that point. He's certainly getting more money being paid union scale than he would ever get through unemployment. And at that point, his mindset, I think it's reasonable to infer, and Commissioner Mason, who wrote the dissent, certainly inferred, they were upset with him with these restrictions. And even Burge said that he wanted to know when the claimant was going to be off of these restrictions, which they weren't accommodating. But where does the overall layoff come? If it's a voluntary layoff, shouldn't the claimant have any say over when the layoff occurs? Well, who had the say? It's in the record. It's Thomas Bromell, the superintendent over the entire job. What does Bromell say? He says, Bromell said that he told Burge that he wanted him to lay the claimant off that day. Why? Quote, because if Joe doesn't want to work for me, I don't want him to be there. That's not a voluntary layoff. That's a personal issue where a man, for whatever reason, internalizes this alleged request for a layoff and says, do it now. If he doesn't want to be here, get him out of here. That's not a voluntary layoff. It's voluntary if it's under the circumstances the claimant asked for. Number one, accommodate my restrictions. But number two, if you're not going to accommodate them, please have the decency to let me go within 45 days. I said they wouldn't accommodate his restrictions. But they didn't accommodate them. They testified that they had light duty available. Right. They always had light duty available. Roth, according to Burge, Roth calls him and tells him that the claimant requested the layoff. Burge testifies that he goes and sees the plaintiff for confirmation. The plaintiff told him, quote, yes, he wanted a layoff because he was coming close to the 45 days. Burge then testifies that he didn't condition his layoff request on the premise that Titan would lay him off anyway. Instead, he just directly asked for a layoff. Now, that's Burge's testimony. Your client may have disagreed with it, but the commission found that he voluntarily requested to be laid off. Brummels said that Titan always had light duty work available for its employees, both in February 2009 and at the time of his testimony. This guy has to be laid off on the very day he shows up. I mean, that's not interstate scaffolding. Interstate scaffolding acknowledges the fact, if you read the quote from interstate scaffolding, they acknowledge the fact that benefits may also be suspended or terminated if the employee refuses work, falling within his physical restrictions prescribed by the doctor. And if the guy, if the day he shows up for work and light duty is available, the guy says fire me, I guess he's kind of refused work, falling within his restrictions. But he didn't do that. He didn't say fire me. He said lay me off. He said if you're going to lay me off after 45 days, have the decency to do it before. That's not what Burge said. That's not what Burge said. So Burge also said we always have, we have light duty work available. We haven't had it. Then the question is, if Burge is to be believed, why didn't they give him light duty work on February 14th? Why didn't he work light duty from the 14th to the 25th? They never gave it to him. There wasn't light duty work. When did he ask for the layoff? The 25th. Yes, sorry, the 25th. And what was the testimony as to whether there was light duty work available for him on the 25th? And the answer was there was. Well, not just that date, just the agenda. You have time on rebuttal. Thank you. Counsel, please. May it please the Court, Counsel, good morning. A lot of the points that I was going to bring up this morning have been made. Who are you? I'm sorry, Andrew Mikauskas on behalf of Respondent Titan Electric. As far as this issue of restrictions, I just want to be clear in terms of the timeline. He returns to work on February 16th. He has restrictions involving no prolonged standing and no overhead work. On February 18th, he's given a full duty release. He has no restrictions. He works for a week with no restrictions. On February the 25th, he comes back with restrictions of no ladder climbing and no kneeling. Now, counsel was very thorough in questioning what the work involved that Mr. Heidel was doing during the course of this project, the roughing, et cetera. That work did not require ladder climbing and did not require kneeling. The work that this man was assigned and was doing as of the date that he came in and requested a layoff is within the restrictions provided. Again, it's a manifest way question as to was the light duty available. There's plenty of testimony. Bill Roth comes in, and he's on light duty at the time of the trial, and it's being accommodated by Titan Electric. Tom Brummel comes in and testifies that light duty was available at that time and was available going forward. That's unrefuted. As far as this issue of the request for a layoff is concerned, there are two individuals that specifically speak with Mr. Heidel. Mr. Roth first has the conversation, confirms that he wants the layoff, is told by Heidel that his days are running, then passes it on to Bill Burch, the general foreman. He has the same conversation specifically with him. There are no conditions. There are no lay me off but only if or lay me off when I get close to 45 or if I'm going to be over 45. There's none of that. There are two people that confirm that specifically. Then there's the actual layoff slip. Joseph requested layoff. That was handed to him. Mr. Burch testified that the only comment Mr. Heidel had was, I thought it would be tomorrow, meaning Friday as opposed to Thursday layoff. There's no uproar. There's no, this isn't right. This isn't what I asked for. There's no union grievance, nothing. There's plenty of evidence. The overwhelming evidence supports the commission's finding that this man requested and received a voluntary layoff. He's not entitled to TTD benefits and interstate scaffolding, as the justices have referenced, that case does not say that just because he's not stabilized he's automatically entitled to TTD. It specifically points out the situation that benefits may also be suspended or terminated if the employee refuses work, falling within the physical restrictions prescribed by his doctor. Specifically to say that's not the situation that we have here in interstate scaffolding. So it's clear that the commission is correct. They have plenty of evidence to find that there was no, or that there was a voluntary layoff and that this man is not entitled to TTD. The interstate scaffolding decision does not change that in any form or fashion. Thank you. Your Honors, let's assume a very clear company policy of you may not graffiti anywhere in the warehouse. You may not disface. Yes. If you take interstate scaffolding to its logical conclusion, if a person is entitled to TTD and he doesn't want to work, he should go to work and tell his boss to go jump off a pier, get fired, and according to interstate scaffolding, he'll get to collect forever. But he can't quit. That is a quit. That is an effective quitting. If you walk into a place and you do as you said and say to your boss, go jump in the lake, I can't stand you, I'll never work for you, et cetera, in order to inflame the boss to fire you, that is an effective termination of your employment. You know what you're doing, you know the consequences, and you are fired. You may not like it, but that's what you're doing. That gentleman knew that if he painted signs on the walls, he was going to get fired. And he did get fired for painting it on the walls, and the Supreme Court said it didn't make any difference. That's right. And let's read what their language says. It says, the touchstones for determining whether the claimants were entitled to TTD was not the voluntariness of their departure from the workforce, but rather whether their conditions had stabilized to the extent they were able to reenter the workforce. Heddle's condition had not stabilized. That's a commission finding. That is the law of the case. It has never been subject to appeal by counsel, by respondents. They agree. The law of the case is his condition hadn't stabilized. You don't look at the voluntariness of the withdrawal from the labor force. You may not like it, but that's what interstate scaffolding says. That's what the law says. What does it mean? It says that if he refuses work, his benefits can be terminated. He didn't refuse? How did he refuse to work? He has to be laid off. It's the same thing as refusing to work. In a conditional manner, he said, if you're going to lay me off after this time, do it ahead of time. That's his side of the story. He didn't have to leave this. That's his side of the story. That's not Burge's side of the story, and that's not Roth's side of the story. But both Burge and Roth acknowledge the fact that if the man had 25 more days to work, he certainly could have worked, and they always accommodate the electrician's request. It's a common request from the electrician. So they knew. Titan Electric knew this policy. They knew what they were dealing with. They're familiar with these conditional requests. They probably get tired of these guys coming up and saying, hey, lay me off at the 44th day. They probably don't like it at all, and I bet you Brumell is the guy who's headed up to here more than anybody, and that's why when Hedl did it, he said, if he doesn't want to work for me, get him out of here today. Send him to slip. So did Brumell fill out the slip? No. Would he be in any better position if he would have said, I want you to lay me off on the 44th day, and they said okay, and they laid him off on the 44th day? That would be voluntary, wouldn't it? It would be voluntary, but according to interstate scaffolding, that wouldn't matter. Okay. Because what you're arguing is under interstate scaffolding, it doesn't matter if he voluntarily lays off. Well, that's what they say. That's what the decision says, and whereas I may also have some issues with that, that's what the decision says. I mean, it certainly says if you get fired, it doesn't matter. Well, but as we were playing out the scenario earlier, you can get yourself fired, and that's a voluntary departure also. We'll probably get that case at some point where the argument will be that it was a voluntary. And that's been decided. Okay. Thank you very much, Ron. Of course, we'll take the matter under advisory for disposition. We'll stand in recess until about 1 o'clock.